UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


SHEILA ROWELL, ET AL.                    CIVIL ACTION

VERSUS                                   NO: 14-2392

SHELL CHEMICAL LP, ET AL.                SECTION: "J" (3)


                           ORDER AND REASONS

   Before the Court is a *Re-Urged Motion to Remand* **(Rec. Doc. 36)** filed by Plaintiffs, Sheila Rowell, Gloria Riley, and Deanna Porter; an opposition thereto **(Rec. Doc. 38)** filed by Defendant, International-Matex Tank Terminals ("IMTT"); an opposition **(Rec. Doc. 40)** filed by Defendant, Shell Chemical LP ("Shell"); a reply to the oppositions **(Rec. Doc. 43)** filed by Plaintiffs; and a sur-reply **(Rec. Doc. 48)** filed by IMTT. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **DENIED**.

                     **FACTS AND PROCEDURAL BACKGROUND**

   This matter arises out of the alleged emission of noxious fumes from a chemical refining facility in St. Rose, Louisiana. Plaintiffs are an unquantifiable group of people who reside, work, or routinely visit the St. Rose area, located in St. Charles Parish, and in close proximity to the 1,000 acre chemical refinery facility ("the facility"), which is jointly operated by

                                    1

Defendants, Shell and IMTT. Plaintiffs allege that as early as June 1, 2014, Defendants began emitting toxic substances from the facility, namely sulfur dioxide and asphalt fumes. Plaintiffs further allege that these fumes carried such a noxious and pungent odor that they "prevented Plaintiffs from venturing outside and enjoying the use of their properties with family and friends." (Rec. Doc. 12-2, at 3.) Plaintiffs also claim that exposure to these fumes and emissions caused certain Plaintiffs to suffer from physical side effects, such as "nausea, vomiting, headaches, eye irritation, and respiratory difficulties." (Rec. Doc. 12-2, at 4.)

On September 11, 2014, three named Plaintiffs, Sheila Rowell, Gloria Riley, and Deanna Porter, filed suit against IMTT and Shell in the Civil District Court for the Parish of Orleans. In their original petition for damages, Plaintiffs asserted various state law claims alleging negligence, trespass, and violation of the terms of a servitude. (Rec. Doc. 1-6, at 5-6.) Plaintiffs seek damages for, *inter alia*, personal injuries, loss of use and enjoyment of property, medical expenses, mental anguish, and diminution of property value. (Rec. Doc. 1-6, at 6-7.) On September 18, 2014, Plaintiffs filed their First Amended and Supplemental Petition for Damages, in which they included class action allegations and sought damages on behalf of all unnamed parties similarly situated as Plaintiffs.

On October 17, 2014, Defendants jointly removed Plaintiffs' lawsuit to this Court, alleging federal jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). Defendants assert that they have met the requirements for removal pursuant to CAFA because the putative class exceeds one hundred persons, minimal diversity under CAFA is satisfied, and the aggregate damages sought by the class exceed $5 million.

Plaintiffs then filed their first Motion to Remand, requesting that the Court remand the matter to the Civil District Court for the Parish of Orleans, on the basis that the matter lacked federal subject matter jurisdiction. The parties' arguments turned on whether the local controversy exception to CAFA applied. Plaintiffs asserted that the exception applied because IMTT's principal place of business was in Louisiana, making it a Louisiana citizen. Shell and IMTT contended that IMTT's principal place of business was in New York at the relevant time. This Court found that IMTT's citizenship was unclear and ordered the parties to conduct discovery on the issue of IMTT's principal place of business.

Following the close of discovery, Plaintiffs filed the instant motion on September 30, 2015. IMTT and Shell filed oppositions on October 14. (Rec. Doc. 38; Rec. Doc. 40.) Plaintiffs filed a reply to the oppositions on October 21. (Rec. Doc. 43.)

3

After obtaining the leave of this Court, IMTT filed a sur-reply on October 27. (Rec. Doc. 48.)

## PARTIES' ARGUMENTS

Before July 2014, IMTT's undisputed principal place of business was in Louisiana, the location of its headquarters and high-level management staff, including its CEO and its President. However, in July 2014, Macquarie Infrastructure Company ("MIC"), a fifty-percent owner of IMTT, purchased the remaining fifty percent and became the full owner of IMTT. MIC is fund owned by Macquarie, a financial services company, and is based in New York City.

In their Motion to Remand, Plaintiffs assert that IMTT's principal place was in Louisiana when they initially filed suit in state court. First, Plaintiffs emphasize that IMTT's "corporate headquarters" has always been located in New Orleans, as IMTT itself has often asserted. According to Plaintiffs, only two executives worked in New York in fall 2014; all other IMTT executives and employees were located in Louisiana. Plaintiffs point out that all of IMTT's terminal managers reported to IMTT President Richard "Rick" Courtney, who worked in New Orleans. Moreover, Plaintiffs argue that any IMTT business conducted by the New York-based executives was performed in New Orleans. If IMTT's principal place of business shifted to New York, Plaintiffs argue that this occurred in October 2014, after their case was filed,

4

because IMTT's SEC quarterly filing dated October 29 referred to the beginning stages of New York executives exercising control over IMTT.

IMTT and Shell argue that the principal place of business analysis turns on the location of the highest ranking officers who exercised significant control over IMTT. According to Defendants, James Hooke, then IMTT's Chief Executive Officer, and James May, then IMTT's Chief Financial Officer, controlled the company from New York. After MIC assumed full ownership of IMTT on July 7, 2014, Hooke and May began exercising ultimate decision-making authority from New York. Thus, IMTT's principal place of business in the fall of 2014 was New York, where it remained until February 2015 when Hooke stepped down as CEO. Shell specifically points out that Hooke and May handled the refinancing of IMTT's credit in the fall of 2014 in New York. Also, New York executives implemented spending procedures for IMTT personnel, hired and determined the compensation of senior officials, approved contracts of a certain value, and made other policy decisions. Shell also points out that MIC's Board approved IMTT's budget.

## **LEGAL STANDARD**

A defendant may remove a civil action filed in state court if a federal court would have had original jurisdiction over the action. *See* 28 U.S.C. § 1441(a). The removing party bears the burden of establishing that federal jurisdiction exists at the

5

time of removal. *DeAguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995). Ambiguities are construed against removal and in favor of remand because removal statutes are to be strictly construed. *Manguno v. Prudential Prop. & Cas. Ins.*, 276 F.3d 720, 723 (5th Cir. 2002).

Congress enacted CAFA to provide for the "removal of class actions involving parties with minimal diversity." *In re Katrina Canal Litig. Breaches*, 524 F.3d 700, 705 (5th Cir. 2008). In order to justify removal pursuant to CAFA: (1) the class action must involve an aggregate amount in controversy in excess of $5 million; (2) there must exist minimal diversity between the parties; and (3) the class must include at least one hundred members. *Rasberry v. Capitol Cnty. Mut. Fire Ins. Co.,* 609 F. Supp. 2d 594, 600 (E.D. Tex. 2009). In order to satisfy minimal diversity, any member of a class of plaintiffs must be a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

Pursuant to the local controversy exception, a court shall decline to exercise jurisdiction:

```
(i)  Over a class action in which --
  (I)   Greater than two-thirds of the members of all
        proposed plaintiff classes in the aggregate are
        citizens of the State in which the action was
        originally filed;
  (II)  At least 1 defendant is a defendant –
        (aa) from whom significant relief is sought by
             members of the plaintiff class;
        (bb) whose alleged conduct forms a significant
             basis for the claims asserted by the proposed
             plaintiff class; and
```

>    (cc) who is a citizen of the State in which the
>    action was originally filed;
>    and
> (III) Principal injuries resulting from the alleged
>    conduct or any related conduct of each defendant
>    were incurred in the State in which the action was
>    originally filed; and
> (ii) During the 3-year period preceding the filing of that
>    class action, no other class action has been filed
>    asserting the same or similar factual allegations
>    against any of the defendants on behalf of the same
>    or other persons.

28 U.S.C. § 1332(d)(4)(A). The burden falls to the party seeking remand to establish that an exception to CAFA applies. *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 797 (5th Cir. 2007). The Fifth Circuit has recognized that the local controversy exception is intended to be a narrow one, "with all doubts resolved in favor of exercising jurisdiction over the case." *Id.* (citing *Westerfield Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010); *Evans v. Walter Indus. Inc.*, 449 F.3d 1159, 1163 (11th Cir. 2006)).

In considering whether the local controversy exception applies, "the jurisdictional facts that support removal must be judged at the time of removal." *Broyles v. Cantor Fitzgerald & Co.*, No. 10-854, 2011 WL 4737197, at *2 (M.D. La. Sept. 14, 2011). Generally, when a case is removed based on diversity, the case must have been removable at the time it was filed in state court, meaning that post-filing changes in a party's citizenship will not

convert a nonremovable case into a removable one.[1] *Gibson v. Bruce*, 108 U.S. 561, 563 (1883). For purposes of traditional diversity jurisdiction, the citizenship of a general partnership is determined by the citizenship of the partnership's constituent partners. *Int'l Paper Co. v. Denkmann Assocs.*, 116 F.3d 134, 137 (5th Cir. 1997); *Temple Drilling Co. v. La. Ins. Guar. Ass'n*, 946 F.2d 390, 393 (5th Cir. 1991). However, for purposes of the local controversy exception, CAFA instructs that "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332.

    The test for determining the location of a company's principal place of business was developed in *Hertz Corp. v. Friend*, in which the Supreme Court of the United States determined that the phrase "principal place of business" "is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities," also known as the company's "nerve center." 559 U.S. 77, 92-93 (2010). The Supreme Court further recognized that this should be the place "where the corporation maintains its headquarters – provided that the

---

[1] CAFA provides that the citizenship of members of the plaintiff class must be determined as of the date of filing the complaint. 28 U.S.C. § 1332(d)(7). While CAFA does not provide the proper time to examine the citizenship of the defendants, the general rule is the same as the statutory rule. Therefore, the citizenship of IMTT must also be determined as of the date of the filing of Plaintiffs' petition.

headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings." *Id.* at 93.

A company can have only one principal place of business, which is "where top officers direct the corporation's activities and not necessarily where a corporation's general business activities take place or where its plants, sales locations, or employees are located." *Elizondo v. Keppel Amfels, L.L.C.*, No. 14-220, 2015 WL 1976434, at *4 (S.D. Tex. May 1, 2015). When the high-level officers are dispersed geographically, the principal place of business is where "a critical mass of controlling corporate officers" works or where "significant corporate decisions and strategy-forming are made," even if some officers live and work in another state where the company's day-to-day activities occur. *Id.* at *7; *see Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 172 (4th Cir. 2014) ("[I]f a corporation's day-to-day operations are managed in one state, while its officers make significant corporate decisions and set corporate policy in another, the principal place of business is the latter.")

## DISCUSSION

The parties do not dispute that, as a general partnership, IMTT is a citizen of Delaware, having been organized under the laws of Delaware. (Rec. Doc. 12-2, at 12; Rec. Doc. 23, at 18). Thus, the determination of IMTT's citizenship, and the application

9

of the local controversy exception, turns on the location of IMTT's principal place of business as of September 2014.

Once MIC became the sole owner of IMTT in July 2014, it began implementing changes to the company. MIC CEO James Hooke became IMTT's CEO, and Macquarie Vice President James May became IMTT's CFO and Senior Vice President. The IMTT Board of Directors was reorganized to consist of Hooke, May, and Todd Weintraub, all of whom worked in New York. (Rec. Doc. 36-5, at 5.) The remainder of the management positions were filled by Louisiana-based IMTT officials.

The level of control exercised by Hooke, May, and the IMTT Board indicates that the "center of overall direction, control, and coordination" was New York. *See Hertz Corp.*, 559 U.S. at 96. The Board was responsible for implementing a delegated authority framework and for setting company policies, including employee policies, accounting policies, and risk management policies. (Rec. Doc. 38-9.) The Board also had the exclusive powers to amend the company's governing documents; set and amend the annual budget; set a five-year business plan; make investment decisions; appoint the CEO, auditors, financial advisors, and legal counsel; and make decisions about the company's insurance policies. *Id.* In addition, the Board was responsible for approving major litigation settlement decisions and contracts when the value of the settlement or contract exceeded $2,500,000. *Id.* Finally, the Board was

10

empowered to hire, evaluate, and determine the compensation of employees who reported directly to the CEO. *Id.*

Hooke and May were also responsible for the overall direction and control of IMTT. Approval from Hooke or May was required to approve any litigation settlements, contracts, or transactions between $500,000 and $2,500,000; change employee benefits below $500,000; contract with aggregate expenditures above $5,000,000; hire and determine compensation of senior officers or others reporting to CEO; file tax returns; operate and close bank accountings and determine signature authority; and establish board debt reserves. (Rec. Doc. 36-5, at 7.) As Chairman of the Board and CEO, Hooke determined who would be appointed to IMTT's executive positions. (Rec. Doc. 36-5, at 6.) May had overall authority for financial services, such as insurance and accounting. (Rec. Doc. 36-7.)

Hooke and May also made several important policy decisions for IMTT. May testified in a deposition that he and other MIC executives developed a business plan to maintain all of IMTT's locations and provide the same customer service after the acquisition. (Rec. Doc. 36-3, at 13-14.) May also led the push to develop financial and safety objectives for the company. (Rec. Doc. 36-9.) In addition, Hooke, May, and the IMTT Board implemented new corporate philosophies after the acquisition, focusing on implementing more diversified financing with different groups,

11

longer terms, and more fixed rates. (Rec. Doc. 38-5, at 8.) The high-level executives also increased the free cash flow of IMTT so that MIC could declare greater dividends to its shareholders. (Rec. Doc. 38-3, at 17.) Thus, IMTT's high-ranking decision-makers worked, set corporate policy, and directed the corporation's business activities in New York. *See Balachander v. AET Inc. Ltd.*, No. 10-4805, 2011 WL 4500048, at *8 (S.D. Tex. Sept. 27, 2011) (citing *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC,* 636 F.3d 101 (4th Cir. 2011)).

As Plaintiffs point out, the remaining IMTT officials at the relevant time were based in Louisiana. Also, Hooke and May each traveled to New Orleans two or three times in the fall of 2014 to conduct IMTT business. However, the top decision-makers – Hooke, May, and the IMTT Board – worked primarily in New York. Plaintiffs argue that all terminal managers reported to IMTT President Richard Courtney, who was based in Louisiana. However, Courtney reported directly to Hooke. (Rec. Doc. 23-12, at 2; Rec. Doc. 36-3, at 12.) Other IMTT executives reported to May, including the Head of Human Resources, the Chief Accounting Officer, the Head of Financial Planning and Analysis, the Head of Risk Management, the Chief Banking Officer, and the Head of Information Technology. (Rec. Doc. 36-3, at 12.)

While day-to-day management activities occurred in Louisiana, this fact is irrelevant to the determination of a company's nerve

12

center. *See Balachander*, 2011 WL 4500048, at *6. Rather, the important consideration is the place of ultimate control by the top decision-makers. As of September 2014, that place was New York. This conclusion is bolstered by the Supreme Court's remark that the nerve center test is designed to eliminate the need for courts to "try to weigh corporate functions, assets, or revenues different in kind, one from the other." *Hertz Corp.*, 559 U.S. at 96.

Based on the record and the Supreme Court's bright-line *Hertz* test, IMTT's "nerve center" in September 2014 was New York. Therefore, IMTT was a citizen of New York and Delaware as of the date of filing the lawsuit in state court. Because IMTT was not a citizen of Louisiana, the local controversy exception to CAFA does not apply, and this Court has subject matter jurisdiction over this case.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' *Re-urged Motion to Remand* **(Rec. Doc. 36)** is **DENIED**.

New Orleans, Louisiana this 18th day of November, 2015.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE